**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JERI K. MILLARD and
MARSHALL N. MILLARD,

        Plaintiffs,

vs.                          Case No. 3:08-cv-851-J-32TEM

UNITED STATES OF AMERICA,

        Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 1, 2006, Plaintiff Jeri Millard was diagnosed with cauda equina syndrome ("CES") caused by an extruded disk at the L4-5 level of her spine, and underwent immediate surgery. Mrs. Millard and her husband, Marshall Millard, brought suit against the United States of America under the Federal Tort Claims Act, alleging that the physician and nursing staff in the emergency department of Tripler Army Medical Center in Honolulu, Hawaii, failed to diagnose Mrs. Millard with CES when she presented complaining of severe low back pain four days earlier, on January 28, 2006. Specifically, Plaintiffs claim that Robert Donovan, M.D., an employee of the Department of the Army, deviated from the standard of care required of an emergency department physician by (1) failing to obtain an appropriate medical history from Mrs. Millard; (2) failing to perform and document a focused and appropriate motor and

1

sensory examination of Mrs. Millard; (3) failing to obtain appropriate imaging studies of Mrs. Millard's lumbar spine; (4) failing to obtain a neurosurgical consult; (5) failing to perform a proper re-examination; and (6) failing to issue Mrs. Millard proper discharge instructions. Further, Plaintiffs claim that the Tripler nursing staff deviated from the standard of care by failing to properly document nursing assessments and a complaint of urinary hesitancy made by Mrs. Millard. Plaintiffs contend that Mrs. Millard sustained serious and permanent injuries as a result of the alleged delay in diagnosing her CES, for which they seek damages.

The matter was tried before the Court on February 8 - 11 and 18, 2010. The parties thereafter submitted proposed findings of fact and conclusions of law (Docs. 33, 34), and, after careful consideration of the record and relevant law, this case is ready for a decision pursuant to Rule 52(a), Federal Rules of Civil Procedure.

I.      THE EVIDENCE[1]

A.      Background

At a certain point on the spine, usually near the first lumbar vertebrae (L1), a person's spinal cord terminates. Below this point, the spinal canal is filled with a mass of nerves and associated blood vessels which branch off the end of the spinal cord and extend to areas such as the pelvis, bladder and legs. This splayed bundle of nerves is known as the cauda equina. CES occurs when some foreign body – such

---

[1]      Where not otherwise indicated, the evidence recited is not contested.

as an extruded or herniated disk – fills the spinal canal and thereby compresses the nerve roots and blood vessels of the cauda equina. CES, which is a rare condition, is considered a neurosurgical emergency requiring immediate decompression of the nerves. Early diagnosis and surgical intervention are essential for CES patients as extended compression results in death of the nerves, which can cause irreversible neurological damage.

CES is best described as the presentation of a group of symptoms in a patient. Those symptoms include bowel and bladder dysfunction, perineal sensory loss (also known as saddle anasthesia), back pain radiating down the legs (often referred to as sciatica), and numbness and weakness in the lower extremities. Some combination of these symptoms, when associated with imaging studies showing compression of the cauda equina, informs the CES diagnosis. Importantly, several of the affiliated symptoms must be present in combination for CES to remain within a physician's differential diagnosis.[2]

**B.  Mrs. Millard's Prior Medical History**

Mrs. Millard has a detailed history of chronic back pain and other serious illnesses. According to her medical records, Mrs. Millard initially suffered a sports-

_____

[2]     A differential diagnosis is a systematic process of elimination used by physicians to diagnose a patient. The method involves working backward from the patient's chief complaint and eliminating worst-case scenarios as the associated symptoms are found to be absent.

related injury in the late 1980's which caused her such "very bad back pain that she could not move."[3] She suffered exacerbations of this pain in February 1998 and again in January of 2000,[4] and received imaging studies on both occasions; the films showed a mild disk bulge at L4-5 and a certain amount of disk degeneration but nothing otherwise significant.

On March 24, 2004, Mrs. Millard presented to the St. Luke's emergency room in Jacksonville, Florida with specific complaints of numbness in her left leg, buttocks and foot; saddle anesthesia; loss of bladder control; and pain beginning in the lower back and radiating down to her left foot which she rated a ten on a one to ten scale.[5] Given the specific nature of her complaints, an emergency neurology consult and MRI of the spine were ordered. The MRI showed no evidence of cord compression or metastasis of the spine.

_____

[3]   Doc. 31, P. Ex. 1, p. 000010.

[4]   At the hospital visit for her February 1998 exacerbation, Mrs. Millard reported pain radiating up to her shoulder and occasionally down to her buttocks, with numbing and tingling sensations in her buttock. See id. at p. 000017. In January 2000, Mrs. Millard was taken from her home in Hawaii via ambulance after experiencing an acute exacerbation of her low back pain such that she was unable to get out of bed. Id. at p. 000014-15.

[5]   In the interim between Mrs. Millard's January 2000 hospital visit and her March 2004 visit to St. Luke's, the Millards relocated from Hawaii to their current residence in Ponte Vedra Beach, Florida. On the morning of March 24, 2004, Mrs. Millard first called Dr. Eidelman, her treating neurologist at the Mayo Clinic, and was advised to go to the emergency room because he had no available appointments until March 31. Doc. 31, P. Ex. 3, MAYO_0405. Dr. Eidelman had treated Mrs. Millard in the past for "persistent neurological symptoms." Id. at MAYO_0399.

Mrs. Millard was seen later that day by Dr. Eidelman, who noted that an "examination of the lower limbs revealed some suggestion of weakness of the left leg[;] [f]or the most part this involved the hamstrings. There was some suggestion of loss of strength in the everters of the foot as well." In his review of the MRI, Dr. Eidelman noted "subtle disk herniation. . . at a number of lumbar levels, but [such] findings would not explain [Mrs. Millard's] clinical picture." As a result, Dr. Eidelman recommended additional testing to further investigate the source of Mrs. Millard's symptoms.[6]

On September 16, 2004, Mrs. Millard saw Dr. Lamer at the Mayo Clinic for an anesthesia/pain management consult. For the first time in her medical records, there is a notation that Mrs. Millard had previously suffered a sciatica injury in 2000. According to Mrs. Millard, pain had persisted since that time, along with intermittent areas of numbness and a "sense that the left leg is not quite as strong as the right leg." Despite this latter feeling, Dr. Lamer was unable to identify any focal muscle weakness on Mrs. Millard's left side.[7] Mrs. Millard rated her average pain score on a day-to-day basis as a 5 or 6 out of 10, which would rise with prolonged sitting. As a result of her continuing treatment by Dr. Lamer and the Mayo pain clinic, Mrs. Millard rated her day-

---

[6]     Id. at MAYO_0397.

[7]     Id. at MAYO(ST LUKES)_0362.

to-day left-side "sciatica" pain[8] as a two out of ten prior to January 28, 2006.[9]

### C. The Events of January 28, 2006

On January 28, 2006, Mrs. Millard was in Honolulu, Hawaii on business, staying at the home of friend and business associate Amy Cooper and her husband. Mrs. Millard was scheduled to return to Jacksonville on January 29. At six o'clock in the morning on January 28, Mrs. Millard turned over to shut off her alarm clock and felt "excruciating pain" in her lower back that she rated a "ten plus." Mrs. Millard testified that the pain was "mind-numbing, almost," and unlike any she had ever experienced.

Mrs. Millard was unable to walk due to the pain. She was helped to the restroom by Mrs. Cooper, and was able to urinate without difficulty; subsequently, the Coopers assisted Mrs. Millard to their living room couch. After several hours passed and Mrs. Millard's condition had not improved, an ambulance was called.[10]

---

[8]    Mrs. Millard described her "sciatica" as pain deep within her left buttocks, radiating down her left leg and into her left foot, with corresponding numbness of the two little toes on that foot and the pad underneath those toes. When asked whether she was experiencing sensations of numbness prior to January 28, Mrs. Millard responded "I don't know if you want to call it numbness. But sciatica pain -- some people refer to that as numbness. Others refer to that as tingling or pain. I call it a tingling, from my left, you know, down through deep into the buttocks, down my left leg, and into my foot and two toes." Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, p. 40.

[9]    Doc. 31, P. Ex. 3, MAYO(ST LUKES)_0361-64; Doc. 27, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 13-14, 42.

[10]    Doc. 27, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 29-30, 90-91, 108-09; Doc. 32, P. Ex. 1, p. 000001.

### 1. Ambulance Transport to Tripler and EMT Report

Mrs. Millard was recumbent on the Coopers' couch when the EMTs arrived at 11:25 a.m. Mrs. Millard recalled informing the EMTs that she had "back problems, ongoing back problems, but never anything like this." Mrs. Millard testified that due to her inability to ambulate, the EMTs were required to place her in a sling and carry her from the couch to the transport.

According to the EMT report, Mrs. Millard informed the EMTs that she had suffered from "constant back pain for years."[11] The report also indicates that Mrs. Millard could move all of her extremities and had denied a fall, loss of consciousness, nausea or vomiting, dizziness, numbness, tingling, heavy lifting, or recent surgeries.[12] The EMTs reported their clinical impression of Mrs. Millard as "exacerbated chronic lower back pain," and categorized her severity as "minor."[13]

### 2. Nursing Care at Tripler

Captain Christopher Hatcher was the triage nurse in the Tripler emergency

---

[11]    Doc. 32, P. Ex. 1, p. 000001. The report makes no mention of an acute change of condition.

[12]    Id. Despite testifying on direct examination that she did not dispute this portion of the EMT report, Mrs. Millard later stated a belief that she had informed the EMTs of her pre-existing left leg tingling (what she refers to as her sciatica), and that they must have failed to record this information. Doc. 27, Trial Tr. Feb. 10, 2010, Jeri Millard, p. 90.

[13]    Doc. 32, P. Ex. 1, p. 000001. Mrs. Millard disputed this latter finding; she testified that the EMTs either did not take her pain seriously or "made a mistake" in documenting the severity of her condition. Doc. 27, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 31-32.

department on January 28, 2006.[14] Cpt. Hatcher stated that he recalled Mrs. Millard and was able to testify about her case from memory. Cpt. Hatcher testified that he placed Mrs. Millard in a room upon her arrival to the emergency department, then spoke with the EMTs who had transported her for a report. Conversely, Mrs. Millard testified that upon arrival at Tripler, Nurse Hatcher initially told the EMTs to place her in the waiting room. According to Mrs. Millard, the EMTs told Cpt. Hatcher: "I don't think you understand, we had to sling this lady to move her. She is not sitting anywhere. She needs to be put into a room."

Cpt. Hatcher entered Mrs. Millard's room and initiated triage at 11:53 a.m. On Mrs. Millard's Emergency Care and Treatment Form 558 (the "558"), Cpt. Hatcher listed Mrs. Millard's chief complaint as chronic lower back pain.[15] Mrs. Millard disputes that this was a normal exacerbation of her back pain, and testified she was unaware that she was categorized as a chronic lower back pain sufferer when she entered the hospital. Despite this, Mrs. Millard did not indicate that she relayed a different chief complaint to Cpt. Hatcher or the EMTs.

Cpt. Hatcher testified that he took a patient history from Mrs. Millard and performed a triage physical assessment. Cpt. Hatcher recalled that Mrs. Millard was

---

[14]    Mrs. Millard testified that Mrs. Cooper was present with her in the Tripler emergency department. Id. at 26. Surprisingly, despite the fact that the Coopers currently reside in the Jacksonville area, Mrs. Cooper was not called to testify at trial. Id. at 146-47.

[15]    Doc. 32, P. Ex. 1, p. 000002.

not crying or in distress; denied numbness, tingling, or weakness; made no mention of bladder or incontinence problems; and was able to move all her extremities. Cpt. Hatcher took Mrs. Millard's vital signs at 12:03 p.m. and testified that her levels, as recorded on the 558, were not consistent with a person in distress. Cpt. Hatcher noted Mrs. Millard's subjective rating of ten out of ten pain on the 558, but testified that he did not agree with this appraisal based on Mrs. Millard's vital signs, the EMT report, his own observations, and her responses to his questions. Cpt. Hatcher categorized Mrs. Millard as a "non-urgent" patient and gave a report to the nurse who took over for him, whom he believes was Windy Pardue.[16]

According to Mrs. Millard, Nurse Pardue took her patient history, administered medication, and took a urine sample. Mrs. Millard testified that she was lying on her left side when Pardue entered her room and asked her to provide a specimen. Mrs. Millard recalled replying, "I'm not going to be able to get up and do this, we're going to have to go on a bedpan." Pardue then slid a bedpan under Mrs. Millard, who rolled to her back and lay on top of the bedpan. Mrs. Millard testified that she had difficulty starting her urine stream, which prompted the following conversation with Pardue: "I

---

[16]     Doc. 22, Trial Tr. Feb 11, 2010, Cpt. Hatcher, pp. 25-36. Mrs. Millard recalls seeing only one staff nurse, a female. Nurse Pardue testified that she does not recall being the staff nurse assigned to Mrs. Millard on January 28, 2006, but does acknowledge that she provided care and treatment to her. Pardue identified the great majority of the nursing notes – the patient history, temperature and distribution of medications on the 558; the discharge instructions – as being in her handwriting.

said to her, Well, I can't seem to start the flow, so I think I'm going to have to stay here a while to be able to do this. And she said, That's fine. Take your time. And she left and left me on the bedpan. And eventually I was able to urinate. . . . It was several minutes before I could ever go."  Mrs. Millard testified that she has a small bladder and a history of frequent urination, but it was "pretty rare" for her to experience difficulty starting her flow.  On cross examination, Mrs. Millard testified that she had given a urine sample lying flat on her back before, and had never had a problem doing so.[17]

There is a Tripler medical record indicating that Mrs. Millard's urine was obtained at 14:08.[18]  However, there is no notation from a nurse on the 558 or anywhere else that the sample was taken, nor that Mrs. Millard had difficulty providing it.[19]  Pardue testified that if she was the nurse taking the urine sample from Mrs. Millard (she had no memory of it), she would have documented both the fact that it was obtained and Mrs. Millard's hesitancy.  She also testified that she would have notified the doctor of the latter, because "if the patient is having back pain and

---

[17]     Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 20-21, 93.

[18]     Doc. 32, P. Ex. 1, p. 000009.

[19]     Pardue testified that "if the patient would have stated that she was having issues with bowel or bladder or numbness, tingling, it would have been written down, the patient would have been considered urgent. The triage nurse would have put her as urgent."  Because the urine sample was not obtained until after triage – and thus, Mrs. Millard did not have occasion to complain of any bladder issues to the triage nurse – Pardue conceded that it would have been the responsibility of the staff nurse taking care of the patient to notify the physician and document the change in condition. Doc. 22, Trial Tr. Feb. 11, 2010, Nurse Pardue, pp. 98-99.

complains of bowel or bladder issues, that's considered a red flag, and you would notify the doctor. . . . [W]ith back pain, if they complain of bowel or bladder issues, numbness, tingling, weakness, it can usually determine that something is wrong with the patient."[20]

### 3.    Dr. Donovan's Treatment

Dr. Donovan, who was board certified in emergency medicine, saw Mrs. Millard in the Tripler emergency department on January 28, 2006.  As Dr. Donovan had no independent recollection of Mrs. Millard, his testimony at trial was dependent on the medical records and his normal patient practice.  Dr. Donovan testified that before seeing any patient, he reviews the nurse's triage notes and the EMT report, if one is available.  In this case, Dr. Donovan found the EMT report significant in light of Mrs. Millard's complaints because she was experiencing no numbness, nor had she experienced any trauma.

Dr. Donovan saw Mrs. Millard for the first time at 14:48.[21]  When Dr. Donovan entered Mrs. Millard's room, he observed her lying on her left side with her hips and knees flexed.  Utilizing a T Sheet providing for a focused assessment of "Low Back Pain / Injury" presentations,[22] Donovan obtained a patient history from Mrs. Millard.

---

[20]     Id. at 97.

[21]     Doc. 31, P. Ex. 1, p. 000005.

[22]     A "T sheet" is a documentation system that provides physicians a specific focus for

He noted her chief complaint as pain in the lower back and buttocks which had started

that morning and continued in the emergency department. Dr. Donovan also recorded

that Mrs. Millard had suffered an old injury to her right sciatic nerve from a prior

epidural,[23] had a history of chronic back pain, was being followed by a pain clinic (i.e.,

Dr. Lamer), and was visiting Hawaii. Regarding Mrs. Millard's pain, Dr. Donovan

noted that it was sharp and burning, radiating down her right posterior side,

exacerbated by movement, and partially relieved by remaining still. Dr. Donovan

noted that Mrs. Millard had suffered similar symptoms previously, and circled that the

pain was "similar to prior back pain(s)" and "moderate" in severity.[24] He circled "prior

---

assessing a patient's given complaint. Doc. 22, Trial Tr. Feb. 11, 2010, Cpt. Hatcher, p. 10. According to Dr. Gabor Kelen, the Defendant's emergency medicine expert, approximately one third of the emergency departments in the country utilize T sheets, and their use is appropriate under the standard of care. The T sheet prompts the physician for what needs to be tested and documented. Circling or checking a particular prompt on the T sheet indicates a positive finding (i.e., the symptom or test result is present or complained of), whereas a backslash indicates a negative (i.e., the symptom or test result is not present or complained of). A positive finding may, but need not, be accompanied by a comment from the physician. Doc. 20, Trial Tr. Feb. 9, 2010, Dr. Kelen, pp. 170, 233. A copy of Dr. Donovan's T Sheet is attached as Ex. A.

[23] This was an error, as the epidural injury and sciatica pain was actually on Mrs. Millard's left side; however, Dr. Donovan did properly indicate her left-sided pain in another section of the T sheet. In addition, Dr. Alfred Frankel, Plaintiffs' emergency medicine expert, testified that such an error did not implicate the standard of care. Doc. 19, Trial Tr. Feb. 8, 2010, Dr. Frankel, pp. 35-36.

[24] Mrs. Millard disputes Dr. Donovan's description of her pain, and testified that what she felt on January 28 was "not even close" to being similar to her prior pain. She described her pain that day as "the most severe pain I have ever been in in my life. And I've had two natural childbirths. And I told them that, in fact." Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, p. 96.

back injury," "prior back pain," and "chronic." In the bottom left corner of the T sheet, Dr. Donovan made certain findings relating to Mrs. Millard's neurological symptomology. Importantly, Dr. Donovan back-slashed through paresis and parasthesias[25] as well as bowel and bladder dysfunction.[26] Similarly, he indicated that Mrs. Millard was experiencing no sensory or motor loss. All of this historical information, Dr. Donovan testified, would have been provided by Mrs. Millard.[27]

Dr. Donovan then proceeded with a physical assessment of Mrs. Millard. He

---

[25] Paresis is partial or incomplete paralysis of a muscle group or nerve group typified by weakness or impaired movement. Parasthesias are the sensation of tingling, prickling, or numbness of the skin, often described as "pins and needles." To make negative findings for these two items, Dr. Donovan testified that he would have asked Mrs. Millard whether she had any "numbness or tingling" or "any weakness" associated with her pain. Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Donovan, p. 115.

[26] Asked about the significance of back-slashing through bowel and bladder dysfunction, Dr. Donovan testified that such a mark "means. . . I asked Ms. Millard about her -- about any bowel or bladder dysfunction, whether she had any difficulty with urinating, whether she had any change in her urinary patterns or her stool patterns, or whether she was incontinent, which means where you urinate on yourself without realizing you're doing it, or whether you're having fecal incontinence, which is whether you're stooling or leaking stool without realizing it." Id. Dr. Donovan noted that a complaint of difficulty urinating differs from a complaint of urinary hesitancy; the former could be a sign of CES while the latter could have other, less serious causes. Id. at 132-34. He testified that neither the nurse nor Mrs. Millard informed him that Mrs. Millard was experiencing difficulty urinating, because he would have documented that fact and followed it with subsequent questioning and an exam of the perineal and rectal areas for potential sensory loss. Id. at 132-33, 146-47. In contrast, Mrs. Millard testified that she directly advised Dr. Donovan that she had experienced "difficulty starting a flow" on the bedpan, and thus his indication on the T sheet that she was experiencing no bladder dysfunction was "absolutely wrong." Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, p. 94.

[27] Doc. 31, P. Ex. 1, p. 000005; Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Donovan, pp. 113-15.

indicated that she appeared to be in moderate distress. Dr. Donovan wrote that she displayed moderate tenderness in her left mid buttock and over the left sacroiliac joint, which increased with active flexion and extension of the hip.[28]

In the neuro/psych section of the T sheet, Dr. Donovan indicated that Mrs. Millard displayed no apparent motor or sensory deficit and that dorsiflexion of her great toes was normal bilaterally. When asked by the Court to describe the motor and sensory exams he would have utilized to make these findings, Dr. Donovan testified:

> In a patient with low back pain, before you do the -- before I do the motor exam, I do the sensory exam. So with the lumbar vertebrae down to the sacral vertebrae -- there are specific dermatomal distributions for the sensory exam, specific locations for their motor exam. So if the particular nerve roots are affected, they will affect these dermatomal distributions. . . .
>
> So when you do your examination, you use a -- a methodologic exam. On a sensory examination, I'm using light touch with my hand. And you actually touch the parts of the -- of the skin in those appropriate areas and compare one side to the other and ask them, Does this feel normal? Yes/no. Does it feel the same as the other side? Yes/no. And you compare the inside of the medial aspect of the thigh with the other medial aspect of the thigh, the lateral thigh on both sides, the anterior knee, again, lateral/medial aspects of the calf, and the lateral aspect of the dorsa. And the reason you do that is because the dermatomes, which is the pattern of the sensory nerves – if you go to the medial and lateral thigh, the anterior, medial, lateral calf, and inside, top, and outside of the foot, then you're checking all the sensory distributions. . . [I]f you're taking the same patient and comparing one side with the other, and touching them and asking those questions, then you can ascertain whether their sensation for those levels from L1 through S1 are intact. . . When you do the [motor]

---

[28]     Doc. 31, P. Ex. 1, p. 000006; Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Donovan, pp. 116-18.

examination, you do their examination against resistance. If they're able to do the same strength on both sides against resistance, then the motor exam is intact. And, again, you do a flexion/extension at the hip and the knee and with moving the ankle and great toe up and down. And, again, it goes through L2. Because there's really no motor activity from the first lumbar vertebra. And its numbers go down on extension, with pushing up at the hip or with the thigh. That's L2-3. So it's the two below those vertebrae. With extension at your knee, it's L3-4. With extension at your knee, it's L3-4. With pushing up on your foot and the great toe, which is dorsiflexion, it's L5. Pushing down with your foot is S1. And pushing down with your thigh -- pushing down on your hip is S1, as well. So if you're comparing one side with the other, then you can compare their strength. And if they're both equal and they're pushing against resistance, then [motor function is] intact.[29]

When asked how long such an exam would take, Dr. Donovan stated that the entirety of the exam he described could be done within a few moments. Dr. Donovan testified that had he discovered any motor deficits, he would "absolutely" have documented them, because an isolated motor deficit would indicate a need to investigate further, perhaps with an MRI, and might indicate a potential surgical emergency. However, Dr. Donovan testified that since Mrs. Millard's motor and sensory function was intact, and she made no complaints of any bowel dysfunction,[30] numbness,[31] or weakness, there was no evidence of any surgical emergency,

---

[29]  Id. at 118, 121-23.  Dr. Donovan stated that he did not conduct either a straight-leg raise or a reflex examination, as neither were indicated on the T sheet.  Id. at 139.

[30]  Mrs. Millard conceded that she did not complain of bowel problems, as none were present at the time.  Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 94-95.

[31]  Mrs. Millard testified that she did not complain of – nor was she experiencing – any numbness at Tripler, either in her legs or in her saddle area.  Id. at 41.  In addition, Mrs. Millard did not contend that she mentioned the pre-existing tingling associated with her left-

including CES.  As a result, he switched his focus to alleviating Mrs. Millard's pain, and ordered 30 milligrams of Toradol and 5 milligrams of morphine at 14:56.[32]

Mrs. Millard disputes that Dr. Donovan performed the tests he described in his testimony.  When asked whether Dr. Donovan conducted any physical assessment of her lower extremities, Mrs. Millard testified: "The only thing he did on me from the waist down was he stood at the end of my bed -- and I don't know what he used, because I couldn't tell what was in his hand. But he ran something over the -- the length of my foot, one of my feet. And I cannot recall which foot. That was it."  When asked whether Dr. Donovan tested her ability to flex her big toe, Mrs. Millard stated "It says here in the records something about my big toe.  And I am not a medical doctor.  He ran something over one of my feet.  And I don't know if that's what he was testing for, was my big toe."  She also refuted the notation on Dr. Donovan's T sheet that he performed any flexion or extension of her hips, saying this "wasn't done."  Nor, testified Mrs. Millard, did Dr. Donovan conduct any flexion tests regarding her feet or toes, any resistance testing of her knees and hips, or any sensory test of the inside or outside of her calf, knee, or thigh.[33]

---

side sciatica problem to Dr. Donovan.  When asked whether he was aware that Mrs. Millard had pre-existing left-sided weakness and sensory changes in the bottom of her left foot, Dr. Donovan answered "No."  Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Donovan, p. 157.

[32]     Id. at 119, 123-24.

[33]     Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 38-39, 106.

According to the T sheet, Dr. Donovan re-examined Mrs. Millard at 16:10. At that time, he noted her condition as "improved" and remarked that she was "up out of bed unassisted - ambulatory unassisted." Mrs. Millard denied that Dr. Donovan ever re-examined her after the initial assessment at 14:48 and does not recall that he came back into the room at any point after their first interaction.[34]

Mrs. Millard does recall that some member – or members – of the Tripler staff came to see her after several hours and asked her if she could stand up. "[T]hey came and said, Do you think you can stand on your own? I said I might be able to stand. It's not going to feel very good. And they stood me up next to my bed and I held on to my bed. And, in fact, I could stand." Mrs. Millard also said that she was able to walk at that time, and that she took a few steps while holding on to the bed. She testified that it was when she stood up and took those steps that she first felt a sense of weakness in both legs.[35]

Dr. Donovan testified that because Mrs. Millard showed improvement and was able to walk unassisted, he would not have (and did not) repeat the detailed

---

[34]     Doc. 31, P. Ex. 1, pp. 000002, 000006; Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 24-25, 37, 109.   Given that Mrs. Millard was administered a heavy dosage of pain medication approximately 45 minutes prior to the 16:10 re-examination, and there is a lack of corroboration for her position (such as from Mrs. Cooper), the Court finds that Mrs. Millard's testimony on this point cannot overcome Dr. Donovan's handwritten T sheet notation that he re-examined her at 16:10 and observed her ambulating at that time.

[35]     Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, p. 23, 109.  Though she felt sensations of weakness, there is no indication that Mrs. Millard relayed these impressions to any member of the Tripler staff.

neurological examination, and that there was no indication for ordering an MRI or for a neurosurgical consult. As Mrs. Millard reported that she was still experiencing pain, Dr. Donovan ordered an additional 5 mg of morphine, which was administered at 16:20. Subsequently, Mrs. Millard's pain level was noted by an unidentified nurse as having been reduced to a seven out of ten. Based on Mrs. Millard's pain improvement, her ability to ambulate, and her previously intact motor and sensory exams, Dr. Donovan ordered Mrs. Millard discharged.[36] Dr. Donovan recorded his Diagnosis/Assessment on the 558 as "Low Back Pain & Sciatica."

### 4. Discharge from Tripler

Mrs. Millard was discharged from the Tripler emergency department at 17:45 by Nurse Pardue. As part of her discharge, Mrs. Millard signed a Patient Discharge Instruction Summary indicating that she had received and understood a series of discharge instructions. Her signature was witnessed by Nurse Pardue.[37]

Using Dr. Donovan's handwritten discharge notes on the 558, Nurse Pardue prepared printed discharge instructions. On the bottom of the one-page discharge

---

[36]     Dr. Donovan testified that as part of his practice, he always visits with the patient at discharge to tell them the diagnosis he has written, review the instructions and answer any questions. Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Donovan, pp. 128-29. Regarding Mrs. Millard specifically, Dr. Donovan testified that "[i]n this case I would have answered questions." Id. at 128. However, there is no documentation on either the T sheet or the 558 of him conducting another visit to Mrs. Millard after his reassessment at 16:10. The Court is therefore unable to conclude that Dr. Donovan spoke with Mrs. Millard at the time of discharge.

[37]     Doc. 31, P. Ex. 1, pp. 000003, 000007.

summary, which Mrs. Millard agrees she received, a statement provides: "The exam and treatment that you received today has been provided on an emergency basis only. If your problem worsens or new symptoms appear, contact your doctor or return to this facility for further care."  The discharge summary also contained the following 'Special Advice' for Mrs. Millard: "Keep your scheduled appointment. Rest. Take meds as directed. Warm or cold compresses for comfort. Return if worse."  The discharge summary's instruction to "Keep your scheduled appointment" was not present on Dr. Donovan's handwritten discharge notes.  Nurse Pardue testified that in the absence of a note from the doctor, she would have included this based on information Mrs. Millard provided.

 Indeed, Mrs. Millard had a previously scheduled appointment on Wednesday, February 1 with Dr. Eidelman, her neurologist at the Mayo Clinic.  Mrs. Millard testified that she informed both Dr. Donovan and Nurse Pardue about this appointment, which was scheduled by Mayo as a follow-up for her sciatica problems.  In addition, Mrs. Millard testified that both Dr. Donovan and Nurse Pardue were aware that she was scheduled to fly home on January 29.  With regard to her discussions on this topic with Dr. Donovan, Mrs. Millard stated:

> We talked about it. I asked him, Is it safe for me to fly home tomorrow? And he said, Yes. . . He clearly knew I was going home the next day. And I asked both he and the nurse if that was okay for me to do that. And everybody indicated that everybody knew that I was flying home. And I was told before I left there that -- that it was fine for me to fly home the next

day.[38]

Mrs. Millard testified that she was surprised by how quickly she was discharged and by the failure of Dr. Donovan to order any imaging studies. She did not ask any member of the Tripler staff about imaging, but she believes Mrs. Cooper did so. After discharge, Mrs. Millard contended that she left Tripler in a wheelchair and was assisted into the Cooper's vehicle.[39]

### D.    Post-Discharge and Return to Jacksonville

After leaving Tripler, the Coopers drove Mrs. Millard back to their house and assisted her to the couch. Mrs. Millard returned to Jacksonville the next afternoon, as scheduled. She was transported in a wheelchair with the assistance of porters in the Hawaii, Dallas, and Jacksonville airports. Mrs. Millard was able to use the restroom in both Dallas and Jacksonville; she testified that she was rolled into the restroom and assisted to the stall, where she was able to urinate. She recalled having difficulty starting her stream. She was able to stand at this point, and could shuffle her feet to get where she was going, although doing so caused her pain.

---

[38]    Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 36-37.

[39]    Id. at 25-26, 42. Conversely, Cpt. Hatcher testified that he recalls seeing Mrs. Millard walk out of the hospital after discharge with another woman (presumably Mrs. Cooper), and that she was walking upright, slowly. Doc. 22, Trial Tr. Feb. 11, 2010, Cpt. Hatcher, pp. 36, 61-62. When asked how he could remember Mrs. Millard walking out of the hospital nearly four years after having treated her, Cpt. Hatcher stated: "Just because of the presentation initially, brought in by an ambulance, not ambulating, to see her walk out, that would -- you know, that would be something I'd like to see for her final." Id. at 67. The Court did not afford weight to this aspect of Cpt. Hatcher's testimony.

Mr. Millard picked Mrs. Millard up at the Jacksonville airport, took her home and lay her down in bed. While Mrs. Millard slept, Mr. Millard called Dr. Eidelman's office to report her condition. He was informed by Dr. Eidelman's nurse that the doctor didn't have any openings before Mrs. Millard's scheduled appointment on February 1, and recommended that they keep that appointment, or go to the emergency room if an emergency situation developed.[40]

### E.    January 30 Visit to St. Luke's Emergency Room

When Mrs. Millard awoke, she asked her husband to help her to the restroom. Mr. Millard picked her up out of bed and tried to stand her up. As he did so, Mrs. Millard testified, "I realized I didn't have any feeling in my legs and I urinated all over myself." At that point, Mrs. Millard asked her husband to clean her up and take her to the hospital.

Mrs. Millard presented to the St. Luke's emergency room at 7:03 p.m. on January 30. Triage was performed at 7:04 p.m., at which time Mrs. Millard's complaints were documented as follows: "Pt presents with c/o bladder incontinence and numbness in both legs with back pain. Pt states she has been incontinent of bladder for the last 2 days. Pt has history of sciatica problems."[41] Despite her

---

[40]    Doc. 21, Trial Tr. Feb. 10, 2010, Marshall Millard, pp. 150, 152-53.

[41]    Doc. 31, P. Ex. 3, MAYO_373. Mrs. Millard also completed a form entitled "Emergency Department Patient Triage/Consent," upon which she answered the question "What is your medical problem (complaint)?" with the response "Legs are numb." Id. at

complaints, Mrs. Millard was not given a room, and was made to wait in the ER in a wheelchair.

The Millards sat in the waiting room for several hours, with Mrs. Millard in severe pain. During this wait, Mr. Millard repeatedly sought out the St. Luke's nursing staff about moving Mrs. Millard to a room, citing her pain level, leg weakness, and numbness, which all seemed to be getting worse. On at least two occasions, Mr. Millard carried Mrs. Millard into the women's restroom because she had lost her bladder awareness. Around 10:30 p.m., Mr. Millard again requested that Mrs. Millard be given a place to lay down, and was again refused. At that point, with Mrs. Millard pleading with him to take her home, Mr. Millard told the triage nurse they were leaving.[42]

Upon returning home from St. Luke's that evening, Mrs. Millard was helped up the front steps by her husband, who asked her to stand and hold onto a rail while he unlocked the door. Mrs. Millard instead tried to take an unassisted step, and rolled her right ankle as a result. Mrs. Millard was later diagnosed with torn two tendons in the ankle, which ultimately required orthopedic surgery.

_____

MAYO_0367.

[42]     Doc. 21, Trial Tr. Feb. 10, 2010, Marshall Millard, pp. 155-57. According to St. Luke's records, Mrs. Millard left without being seen at 11:34 p.m., four and a half hours after arriving. Doc. 31, P. Ex. 3, MAYO_372.

**F.  February 1, 2006 Appointment and Subsequent Surgery**

Mrs. Millard remained in bed on January 31, heavily medicated.  On February 1, she saw Dr. Eidelman at the Mayo Clinic.  Dr. Eidelman conducted a thorough neurological examination of Mrs. Millard, and dictated the following narrative regarding the history of her condition:

> Mrs. Millard presents with an acute onset of low-back pain and leg weakness.  Symptoms developed [Saturday, January 28] while on a trip to Hawaii. The patient initially experienced intense pain, which seemed to radiate horizontally across the lower back.  This was later followed by discomfort, which was experienced in the posterior upper thighs. Both legs being involved.  She later became aware of intense numbness in the right leg, this later spreading to the left side.  Strength in the lower limbs has since declined and Mrs. Millard described what appears to be distal weakness.  Bladder dysfunction has also become apparent, the patient being aware of difficulty with voiding and at times has also been incontinent.[43]

Dr. Eidelman recorded his clinical impression as "cauda equina lesion," and ordered an urgent MRI of the lumbar and lower thoracic spine at St. Luke's.  The MRI indicated a giant L4-5 disk extrusion compressing the cauda equina and the thecal sac.  Mrs. Millard was admitted to St. Luke's to be prepared for surgery the following morning.[44]

At St. Luke's, Mrs. Millard met with a Mayo neurologist named Dr. Brott, who recorded another detailed history:

---

[43]     Id. at MAYO(ST LUKES)_0294.

[44]     Id. at MAYO_0454.

Mrs. Millard is a 49-year-old right-handed white female who noticed back pain that is described as sharp and burning in the upper buttocks and lower back bilaterally on Saturday, 1/28/2006, while in Honolulu, Hawaii. She also felt that she had some leg weakness at that time and some difficulty walking but could walk on her own accord. She also felt that she had some difficulty starting her urine and was unable to have a bowel movement. She was evaluated at a hospital in Honolulu but no imaging was done. . . She was given oxycodone and Naprosyn for the pain. *She negotiated with the physicians there to be treated at her home here in Jacksonville.* She arrived by plane on Monday, January 30, with progression of symptoms. She describes more difficulty walking, dyesthesias in her feet to her waist. She also had severe pain that now was radiating down to her feet. She came to St. Luke's Hospital Emergency Room and, because of her discomfort and the long wait, left the ER without being evaluated. On January 31, she stayed in bed secondary to the pain and felt she could not move her legs. The numbness involved her legs from her toes to her waist.[45]

After examining Mrs. Millard and reviewing the MRI, Dr. Brott's assessment was "[c]auda equina syndrome with a subactue presentation of leg weakness, saddle anesthesia, urinary and bowel retention."[46] On the morning of February 2, Mrs. Millard underwent a procedure which her neurosurgeon, Dr. Wharen,[47] described as a "Left L4 partial hemilaminectomy, removal of giant L4-5 disk extrusion." The post-operative

---

[45]    Id. at MAYO_0452 (emphasis added). Despite Dr. Brott's notation that she was unable to have a bowel movement in Hawaii, Mrs. Millard indicated upon her admission to St. Luke's that her last bowel movement had occurred on January 28. Id. at MAYO_0622.

[46]    Id. at MAYO_0454.

[47]    In a handwritten pre-operative note dated February 2, 2006 at 8:15 a.m., Dr. Wharen provided yet another patient history for Mrs. Millard. He noted that Mrs. Millard experienced an "onset of severe [low back pain] on Saturday in Hawaii. On Monday developed weakness in both legs & urinary incontinence." Id. at MAYO_0478.

diagnosis was a "Giant L4-5 disk extrusion, cauda equina syndrome."[48]

Mrs. Millard remained at St. Luke's for several days after surgery, and was discharged on February 8. The St. Luke's discharge summary states that "[a]fter surgery, the patient did slowly regain function in her bilateral legs. . . . She also regained some sensory function in her right leg. The patient required enema taps and manual bowel disimpaction during the hospitalization. The patient was discharged to Brooks Rehab[ilitation Facillity]."[49] Mrs. Millard remained at Brooks for approximately two weeks, during which time she received physical and occupational therapy, was taught to self-catheterize and began to relearn how to ambulate. Mrs. Millard testified that she was required to leave Brooks in a wheelchair, but returned to walking soon thereafter. She continued her physical therapy on a home and outpatient basis.[50]

Mrs. Millard testified that as a result of the CES, she suffers from bladder and bowel dysfunction, sexual dysfunction, right and left leg sensory loss, right leg nerve damage and motor weakness, and difficulties related to the right ankle injury.[51] Dr.

---

[48]    Id. at MAYO_0465.

[49]    Id. at MAYO_0450.

[50]    Doc. 21, Trial Tr. Feb. 10, 2010, Jeri Millard, pp. 54-55.

[51]    Id. at 62-71, 81-82.   The Court also heard the testimony of certified life care planners John Roberts (Plaintiffs' expert) and Robynanne Cash-Howard (the government's expert), who offered opinions at trial regarding the cost of Mrs. Millard's future medical needs, and economist Dr. Paul Mason (Plaintiffs' expert), who offered opinions regarding the present day value of those medical needs.  The parties stipulated to the present day value opinions offered by the government's economist, Dr. David Williams, in lieu of his testimony at trial.

Mark Hofmann, a board certified physiatriast retained by the government to conduct an independent medical examination of Mrs. Millard, testified that Mrs. Millard has secondary bowel and bladder dysfunction, impaired sensation in her right foot and right lower leg weakness, and that her condition is permanent and stable. In Dr. Hofmann's opinion, Mrs. Millard required no further medical care, assistive devices, or rehabilitation, and faced no occupational restrictions.[52] Plaintiffs offered no expert medical testimony as to Mrs. Millard's current condition; thus, the only testimony on this subject came from Dr. Hofmann and Mrs. Millard herself.

## G. Expert Testimony

The parties agree that when Mrs. Millard presented to the St. Luke's emergency department on January 30, she was clearly exhibiting the signs and symptoms associated with CES. The ultimate question in this case is whether Mrs. Millard presented to Tripler on January 28 with symptoms of CES such that the Tripler staff in general, and Dr. Donovan in particular, fell below the standard of care by failing to recognize those symptoms and order further testing or consultation to confirm or rule out a potential CES diagnosis.[53]

---

[52]     Doc. 22, Trial Tr. Feb. 11, 2010, Dr. Hofmann, pp. 173-74.  The majority of Dr. Hofmann's testimony focused on items in Mr. Roberts' life care plan that Dr. Hofmann did not feel were necessary based on his assessment of her condition.

[53]     Plaintiffs have asserted claims for violations of the nursing standard of care, and offered the expert testimony of registered nurse Todd Keith on this subject.  Nurse Keith opined that the Tripler nursing staff performed incomplete assessments of Mrs. Millard, and

### 1.    Testimony of Dr. Hubert Aronson and Dr. James Harrop

Dr. Hubert Aronson, a board certified neurosurgeon with a limited private practice in Miami, was Plaintiffs' neurosurgical expert.  Dr. James Harrop, a board certified neurosurgeon with an active hospital practice in Philadelphia, was the government's neurosurgical expert.  Both experts offered opinions regarding the onset of Mrs. Millard's CES symptoms and the timing of surgical intervention.

Dr. Aronson and Dr. Harrop agreed that there was only one "rupture" of Mrs. Millard's L4-5 disk.  Similarly, the experts concurred that the only documented "event" which would indicate a disk rupture occurred on the morning of January 28 when Mrs. Millard turned off her alarm.  Dr. Aronson opined that the full disk extrusion occurred at that time, and thus, had an MRI been taken on January 28, it would look the same as the MRI taken at St. Luke's on February 1.[54]

---

inadequately documented those assessments they did perform. Doc. 19, Trial Tr. Feb. 8, 2010, Nurse Keith, pp. 153-54.  However, Plaintiffs offered no evidence (including from Nurse Keith) indicating that Cpt. Hatcher or Nurse Pardue were responsible for performing examinations that would have provided different or more detailed information than was directly obtained by Dr. Donovan.  In addition, Plaintiffs did not identify any information that the Tripler nursing staff failed to document that was not directly relayed to Dr. Donovan by Mrs. Millard.  For example, because Mrs. Millard testified that she directly informed Dr. Donovan of difficulty starting her urine flow, it is inconsequential whether Nurse Pardue failed to document it, or whether such information would have caused a triage nurse to categorize her as "urgent" rather than "nonurgent."  Thus, the Court views the care provided by the Tripler staff as a continuum, and addresses whether Mrs. Millard presented CES symptoms – at any point during her Tripler visit – such that the treatment she received (or did not receive) rose to the level of a violation of the standard of care.

[54]    Doc. 20, Trial Tr. Feb. 9, 2010, Dr. Aronson, pp. 29-30.  When asked if the extrusion could instead have progressed over time, Dr. Aronson testified there was "no way [he] could predict that" and that he was relying on his opinion that Mrs. Millard exhibited symptoms

It was Dr. Aronson's opinion that Mrs. Millard presented to Tripler with sufficient signs and symptoms to make a diagnosis of CES. Specifically, he noted her severe back pain, inability to walk,[55] trouble starting her urinary stream,[56] and the pre-existing weakness and numbness she had reported to Dr. Lamer in 2004, which Dr. Aronson contended would have been discovered at Tripler by a careful motor and sensory exam. Dr. Aronson did concede, however, that "[u]nless you have the other neurological changes, you cannot make a diagnosis of cauda equina syndrome just on the basis of pain." Dr. Aronson also acknowledged that Mrs. Millard's symptoms were more severe after her return to Jacksonville, but opined that this was because Mrs. Millard had persistent compression of the nerves for several days, causing her symptoms to worsen by the time she had surgery.[57]

---

consistent with CES at Tripler. Id. at 64. However, when asked about the signs and symptoms a patient with an extrusion such as the one visible on the February 1 MRI would experience, Dr. Aronson answered: "If it's a giant extrusion of the disk material, such as we see here, you're almost always going to get some neurological involvement. You're going to almost always get some evidence of weakness, numbness, reflex changes, disturbance of function of bladder and bowel." Id. at 32.

[55] Dr. Aronson gave no credence to Dr. Donovan's notation that Mrs. Millard was able to walk unassisted upon reexamination. He instead credited Mrs. Millard's deposition testimony that she was only able to take a few steps from the bed to a wheelchair while leaning on the bed rail for support. Id. at 53, 61.

[56] Dr. Aronson was asked whether Mrs. Millard should have been able to provide a urine sample with a complete disk extrusion. His interpretation of the events was that "[s]he didn't voluntarily do it. She had to do it with incontinence. She had difficulty starting her urine stream on the 28th. She was not able to go to the bathroom. They had to put her on a bedpan." Id. at 53.

[57] Id. at 36-38, 41, 51.

Dr. Harrop believed that an extrusion to extent exhibited in the February 1 MRI – and thus, complete compression of Mrs. Millard's cauda equina – did not occur until some time after the initial January 28 rupture.[58]  The basis for Dr. Harrop's opinion was that if Mrs. Millard had experienced a full extrusion on the morning of January 28, he would expect that the symptoms she displayed at Tripler would have been very similar to those she presented at St. Luke's on January 30.  Dr. Harrop noted that Mrs. Millard's entire spinal canal was filled with disk material in the February 1 MRI, which was causing severe compression of her nerve roots.  Thus, Mrs. Millard's ability to provide a urine sample at Tripler was significant to Dr. Harrop, because he would expect her to be totally unable to urinate if she was experiencing the same degree of compression present on the February 1 MRI.[59]

Also significant to Dr. Harrop was Dr. Donovan's notation that dorsiflexion of the great toe was normal, because "[i]f your toe is working and you have full strength in it, it means the [L5] nerve is working, which means that [it is] not being inhibited, such as by a disk herniation or a pressure on the nerve."[60]  Ultimately, Dr. Harrop opined

---

[58]     Doc. 23, Trial Tr. Feb. 18, 2010, Dr. Harrop, pp. 14-15, 73-74.  Dr. Harrop testified that in many instances, patients will experience a disk hernation where disk material leaks out of the annulus and causes certain symptoms (such as sciatica pain), but the actual "explosion" of the disk causing compression of the cord or cauda equina does not occur until a later time.  Id. at 23-24.  This opinion was shared by Dr. Kelen.  See Doc. 20, Trial Tr. February 9, 2010, Dr. Kelen, pp. 246-47.

[59]     Doc. 23, Trial Tr. Feb. 18, 2010, Dr. Harrop, pp. 15-16.

[60]     Id. at 20.  Dr. Kelen and Dr. Harrop both testified that the test for dorsiflexion of the

that Mrs. Millard developed CES sometime after she left Tripler because when she presented on January 28, "[s]he didn't have any urinary problems. She didn't have any bowel problems. She was walking, ambulating. Her physical exam was, quote, normal, meaning she didn't have any motor problems. She didn't have any sensory problems. And she was voiding on her own."[61]

Both Dr. Aronson and Dr. Harrop also offered opinions as to the specific damage caused to Mrs. Millard by the lack of immediate surgical intervention. Dr. Aronson, when asked his opinion as to Mrs. Millard's outcome had she had surgery on January 29 instead of February 2, said only "I think she'd be better than she is today." When asked to quantify how earlier surgical intervention would have improved Mrs. Millard's outcome, Dr. Aronson stated "I never do that. Because you can't tell how much of her deficit is related to irreversible damage of the nerve. And that's why earlier intervention is so important, because you do not know."[62]

---

great toe was significant in Mrs. Millard's case because the disk which ultimately extruded to compress her cauda equina was directly correlated to this particular test. See Doc. 20, Trial Tr. February 9, 2010, Dr. Kelen, p. 181. Interestingly, when asked whether Dr. Donovan had indicated that this test was normal, Dr. Aronson responded "I don't remember reading that. But. . . everything he said was normal as far as this woman was concerned." Doc. 20, Trial Tr. Feb. 9, 2010, Dr. Aronson, p. 54.

[61]     Doc. 23, Trial Tr. Feb. 18, 2010, Dr. Harrop, pp. 20-21.

[62]     Doc. 20, Trial Tr. Feb. 9, 2010, Dr. Aronson, pp. 34, 64-65. Dr. Aronson also testified that because it was impossible to tell when such nerve damage occurs, it was possible that any permanent damage Mrs. Millard suffered could have been done on the morning of January 28, before she even arrived at Tripler. When asked whether he could quantify any potential improvement if Mrs. Millard had had surgery after going to St. Luke's on January 30, Dr. Aronson responded "Absolutely not. No." Id. at 67-68.

Dr. Harrop concurred, noting that the earlier pressure can be removed from the compressed nerves, the better CES patients will do in the long run. However, when asked by the Court if he could say how much better, Dr. Harrop replied "I would say there is nothing that you can say."[63]

### 2. Testimony of Dr. Alfred Frankel and Dr. Gabor Kelen

Dr. Alfred Frankel, a board certified emergency medicine physician, was Plaintiffs' expert to establish the standard of care in emergency medicine. Dr. Gabor Kelen, also a board certified emergency medicine physician, was the government's expert on the same subject. Both experts provided opinions as to whether Dr. Donovan (1) took an appropriate medical history; (2) performed an appropriate physical examination; (3) inappropriately failed to obtain imaging studies; (4) inappropriately failed to obtain a neurosurgical consult; and (5) failed to issue Mrs. Millard proper discharge instructions.

Dr. Frankel testified that it is the responsibility of the emergency department to perform an appropriate triage evaluation, diagnose the patient's condition, stabilize the patient, and then make an appropriate disposition (either by admitting the patient to the hospital or sending the patient home). Dr. Frankel noted that in evaluating patients, an emergency medicine physician must always think "worst case scenario." Thus, the standard of care requires an emergency room physician to rule out

---

[63]     Doc. 23, Trial Tr. Feb. 18, 2010, Dr. Harrop, p. 26.

conditions that may be threatening to life and limb.

Dr. Frankel testified that Dr. Donovan's patient history was inadequate because he failed to note the acute onset of Mrs. Millard's pain or that the pain she was experiencing at Tripler was different from her prior chronic pain. He also criticized the documentation of Mrs. Millard's physical examination and noted that Dr. Donovan failed to perform reflex or straight leg testing.[64] In addition, Dr. Frankel contended that a careful neurological exam would have revealed Mrs. Millard's pre-existing left leg weakness and numbness, and that such a discovery would have been sufficient to warrant imaging studies.[65] Regarding Mrs. Millard's urinary symptoms, Dr. Frankel testified that any complaints should have been documented and followed up with further testing. However, he acknowledged that it was reasonable for an emergency room physician to rely on a patient's denial of bowel or bladder dysfunction, and that were a patient to deny such problems he would "absolutely" not be as concerned about CES.[66]

Based upon Mrs. Millard's pre-existing sciatica symptoms, her pain and inability

---

[64] Dr. Frankel did concede that these tests were discretionary and indicated that the straight leg raise would not necessarily inform a CES diagnosis, an opinion shared by Drs. Donovan, Kelen, and Harrop. Doc. 19, Trial Tr. Feb. 8, 2010, Dr. Frankel, p. 95. Dr. Frankel also opined that the standard of care would not necessarily require Dr. Donovan to order an MRI upon a finding of asymmetrical reflexes. Id. at 124.

[65] When asked whether Mrs. Millard denied numbness and tingling to the EMTs, Dr. Frankel conceded that she had, but that he still believed both were present. Id. at 121-22.

[66] Id. at 35-36, 43-44, 55-57, 89-91.

to ambulate, and her difficulty starting a urine stream, Dr. Frankel testified that Dr.

Donovan was required by the standard of care to order an MRI.[67]  Assuming a positive

finding on the MRI, Dr. Frankel testified that a neurosurgical consult was mandatory;

however, he felt that an MRI taken on January 28 "would [not] have shown the degree

of extrusion and herniation you had on. . . [February] 1st."[68]

Dr. Kelen opined that the nucleus of Mrs. Millard's disk did not escape and

compress the cauda equina until some time after the initial rupture.[69]  Based on the

symptoms with which Mrs. Millard presented to Tripler, Dr. Kelen testified that the

patient history documented by Dr. Donovan was appropriate.[70]  Dr. Kelen noted that

---

[67]    However, Dr. Frankel conceded that such imaging would not be necessary if Mrs. Millard displayed normal motor and sensory functions and reported only pain, as Dr. Donovan's T sheet indicates.  Id. at 105.

[68]    Id. at 66.

[69]    When asked to explain the progression of Mrs. Millard's symptoms from those exhibited at Tripler on January 28 to those with which she presented at St. Luke's on January 30, Dr. Kelen testified: "My belief is that [her disk] ruptured [on the 28th], maybe some stuff came out. But the extrusion, the actual extrusion of that -- that got to that point, developed after she left. And there's no other way to explain the dramatic difference, no matter what the subtlety stuff is. [Y]ou cannot explain the dramatic difference. . . . And the only explanation is that this thing grew and grew and grew until it was causing serious symptomology.  And that serious symptomology was evident by the time she got to Jacksonville.  I mean, that was a day and night difference."  Doc. 20, Trial Tr. February 9, 2010, Dr. Kelen, pp. 247-48.

[70]    After a review of the Tripler medical records, Dr. Kelen concluded that "[Mrs. Millard's] symptoms were predominantly back pain and an inability to ambulate."  Doc. 20, Trial Tr. February 9, 2010, Dr. Kelen, pp. 169-70.  In addition, Dr. Kelen noted that the EMT report, triage note, and Dr. Donovan's T sheet all identified Mrs. Millard's chief complaint as exacerbation of chronic low back pain.  Id. at 184-85.

Mrs. Millard denied paresis and parasthesias, as well as any bowel or bladder dysfunction. Since bladder problems, numbness, and weakness were not present, Dr. Kelen opined that "a lot of things [get] peeled off [the differential diagnosis] very quickly" and that "cauda equina is no longer on the list."[71]

With regard to Mrs. Millard's assertion that she complained of urinary hesitancy to Dr. Donovan, Dr. Kelen agreed that such a complaint should have been documented and explored to determine if imaging was required. However, because Mrs. Millard was able to provide a urine sample and reported having had a bowel movement on January 28, Dr. Kelen concluded that she was not experiencing bowel or bladder dysfunction at Tripler.[72] This was extremely significant, Dr. Kelen noted, because the literature on CES is unanimous that "some bowel, bladder, or saddle anasthesia, or various combinations thereof, is. . . part of the [CES] definition. So for those of us in practice, it's a really big deal when the patient can tell you that they don't have any bowel or bladder dysfunction. It almost takes [a CES] diagnosis out of consideration for us."[73]

_____

[71]     Id. at 165-66, 170-71, 173, 184-86, 205-06.

[72]     Regarding her difficulty in providing a sample, Dr. Kelen testified "you know, patients are in pain, have a little hesitancy, and then I ask them can you urinate and they urinate, I'm a pretty happy camper at that point." Id. at 237. Ultimately, Mrs. Millard's ability to provide a urine sample indicated to Dr. Kelen that she had control of her bladder at Tripler; similarly, the fact that she reported having had a bowel movement on January 28 indicated to Dr. Kelen that she still had control of her bowels at that time. Id. at 172.

[73]     Id. at 171-72.

Dr. Kelen opined that Dr. Donovan performed an appropriate motor and sensory examination based upon the history he received from Mrs. Millard.[74]  In Dr. Kelen's opinion, the most significant neurological findings made by Dr. Donovan were the normal dorsiflexion of Mrs. Millard's big toe (which was lost upon her exam at Mayo on February 1, indicating a progression of symptoms) and the observation that she was able to walk unassisted upon reevaluation (belying weakness of the legs).[75]  As to the contention that Dr. Donovan's assessment was inadequate due to his failure to discover any pre-existing left leg numbness or weakness, Dr. Kelen agreed that such problems, if present, would have been discovered by an appropriate neurological exam.  However, he noted that, based on a review of Mrs. Millard's medical records, such symptoms were either intermittent or not always detectable as they had not been

---

[74]     Id. at 184-85.  Dr. Kelen provided a description of a standard motor and sensory examination which contained the same elements as Dr. Donovan indicated he would have performed on Mrs. Millard.  In so doing, Dr. Kelen refuted the contention that Dr. Donovan's failure to conduct straight leg and reflex testing caused him to overlook a CES diagnosis.  Dr. Kelen noted that a straight leg raise is "neither here nor there" with regard to CES, and that reflexes might inform the diagnosis to the extent that they were completely absent, but for that to be the case, the patient would have to be unable to walk, which Mrs. Millard was able to do upon request.  Id. at 176-80.

[75]     Dr. Kelen testified that Dr. Donovan's re-evaluation of Mrs. Millard was sufficient because of the significance of her ability to walk unassisted.  Id. at 191, 239-40.  Dr. Kelen testified that "[t]he chance of having. . . significant muscle weakness is almost impossible if you're able to fully bear weight and take a few steps.  Patients with cauda equina would typically collapse [if you] even dare to get them up."  Id. at 191.  Dr. Kelen's testimony on this point is persuasive given Mrs. Millard's subsequent condition on January 30, when she was unable to bear weight when taking a step and injured her ankle as a result.

consistently confirmed from one physical examination to the next.[76]    Because there

was no indication of a surgical emergency based upon the history obtained from Mrs.

Millard and the motor and sensory exam conducted by Dr. Donovan, Dr. Kelen opined

that neither an MRI nor a neurosurgical consult were required.  He similarly concluded

that, on the basis of Mrs. Millard's symptoms, a discharge instruction to "return if

worse" was appropriate.[77]

## II.    THE LAW

Under the FTCA, the United States may be held liable for "personal injury or

death caused by the negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment" in the same

manner and to the same extent as a private person under like circumstances. 28

U.S.C. § 1346(b)(1).  The law of the state where the alleged negligent act or omission

occurred governs the rights and liability of the parties.  Id. at § 1346(b); Richards v.

United States, 369 U.S. 1, 11 (1962).  Because the events in question occurred in

Hawaii, the parties agree that Hawaii law applies to this medical malpractice action.

To prevail on a claim for medical malpractice in Hawaii, a plaintiff must establish

---

[76]     Id. at 181, 185, 224-28.

[77]     Id. at 187-189, 248.  Dr. Kelen found it significant that the discharge instructions
advised Mrs. Millard to keep a previously scheduled appointment with her treating physician,
especially when considering the question of whether Dr. Donovan acted reasonably by not
seeking a neurosurgical consult.  Dr. Kelen noted that the standard of care did not require
that the instruction "keep your scheduled appointment" be more specific.  Id. at 248.

the following elements by a preponderance of the evidence: duty and standard of care; breach of the standard of care; and "the causal relationship between the breach and the injury suffered." Barbee v. Queen's Medical Center, 194 P.3d 1098, 1120 (Haw. Ct. App. 2008); Haw. Jury Instruction 3.2 (Burden of Proof); Haw. Jury Instruction 14.1 (Elements of Medical Negligence). A plaintiff must establish the applicable standard of care and the defendant's breach of the applicable standard of care through expert testimony. See Craft v. Peebles, 893 P.2d 138, 149 (Haw. 1995). Under Hawaii law, both physicians and nurses have a duty "to have the knowledge and skill ordinarily possessed, and to exercise the care and skill ordinarily used" by such a professional "practicing in the same field under similar circumstances." Haw. Jury Instruction 14.2 (Standard of Care). Failing to perform these duties constitutes a breach of the standard of care. McBride v. United States, 462 F.2d 72, 73 (9th Cir. 1972).

## III.    THE COURT'S DECISION

CES is a relatively rare condition marked by an affiliation of symptoms including numbness, tingling and weakness in the lower extremities; radiating lower back pain; bowel and bladder dysfunction; and saddle anesthesia. The Court is persuaded by the testimony of Drs. Harrop and Aronson that where CES is caused by the herniation or extrusion of a disk, these symptoms – several of which must be present to inform the CES diagnosis – can present in a delayed fashion, whether by virtue of a gradual

extrusion of the disk or compression of the nerves over time.[78] The Court also accepts

the testimony of Drs. Kelen and Frankel that in the absence of bowel or bladder

dysfunction, saddle anesthesia, numbness, tingling, or weakness, an emergency

medicine physician – who is trained to perform focused assessments so as to rule out

surgical and other emergencies – can properly remove CES from his differential

diagnosis.

On January 28, Mrs. Millard was transported by ambulance and presented to

Tripler with severe lower back pain radiating down her right buttocks; she was unable

to walk upon admission.[79] Mrs. Millard acknowledges that she was not suffering from

saddle anesthesia or bowel dysfunction at Tripler. The record does not reflect that

Mrs. Millard complained to Dr. Donovan or any other member of the Tripler staff of any

weakness, numbness or tingling in her legs, and Dr. Donovan's T sheet indicates that

---

[78] It is of note that three of the four experts – Drs. Kelen, Harrop, and Frankel – testified to their belief that on the morning of January 28 Mrs. Millard did not have a disk extrusion to the degree indicated on the February 1 MRI, by which time her symptoms had severely worsened.

[79] Mrs. Millard did not expressly testify that she complained of something other than an exacerbation of her prior back pain when she presented to Tripler, but intimated that she did not endorse this assessment of her condition. However, to the extent that Mrs. Millard contends that she notified Tripler staff of an acute change of condition rather than an exacerbation of her prior back pain, such a claim appears to be refuted by the record. Each of the EMT report, Cpt. Hatcher's triage note on the 558, and Dr. Donovan's T sheet make explicit reference to Mrs. Millard's chronic and ongoing pain, while none indicate that Mrs. Millard complained of an acute change in her condition. Dr. Donovan's T sheet indicates that Mrs. Millard informed him that the pain was "similar to prior back pain." That three separate individuals who took historical information from Mrs. Millard identified her chief complaint in such similar fashion is persuasive to the Court.

Mrs. Millard denied paresis (tingling) or parasthesias (numbness).[80]

Because Mrs. Millard presented to Tripler with a history of chronic back pain and made no complaints of numbness, weakness, tingling, saddle anesthesia, or bowel or bladder dysfunction, the crux of the liability issue in this case is whether Dr. Donovan conducted a sufficient motor and sensory examination of Mrs. Millard to be able to independently rule out such symptoms, the presence of which might have led to a more serious diagnosis, such as CES. Dr. Donovan, not surprisingly, has no independent recollection of Mrs. Millard's case. However, the contemporaneous written record of Dr. Donovan's examination shows that he considered and ruled out the type of physical and neurological symptoms which would have led to a suspicion of CES and prompted imaging studies to be required. Dr. Donovan testified that his marking of the T sheet with a slash shows that he had, either through questioning or testing, found each such symptom to be negative. Mrs. Millard, while acknowledging that Dr. Donovan performed some "hands-on" testing, denies that he did the complete work-up or follow-up as recorded on the T sheet. To a large extent, the testimony of the emergency medicine experts, Drs. Kelen and Frankel, concerning the propriety of

---

[80] This finding is bolstered by the February 1 narratives of Dr. Eidelman and Dr. Brott, both of which indicate that Mrs. Millard initially suffered pain on January 28, which was followed at a later time by sensations of numbness and, ultimately, weakness to the point that she was unable to support herself. Further, though Mrs. Millard testified that she felt leg weakness when she stood to walk at Tripler, there is no evidence that she communicated this to the Tripler staff.

Dr. Donovan's care, is dependent on whether Dr. Donovan actually did what the T Sheet says he did.

Of course, we will never know for certain what happened that day. However, in the end, the Court finds that Mrs. Millard has failed to prove by a preponderance of the evidence that Dr. Donovan fell below the standard of emergency care in treating her. In making this finding, it is important to note the special role of an emergency medicine physician. The emergency physician is required to ascertain, based on a patient's presentation in the emergency department, whether there is an emergent situation requiring immediate action. If there is not, the emergency physician will discharge the patient and refer them to their treating doctor or a specialist for appropriate follow-up.[81] The testimony established that low back pain is one of the most common complaints in the emergency department, and only rarely results in an emergency situation. Further, the presentation of CES in patients with a history of

------

[81] Hawaii's standard of care requires a determination whether Dr. Donovan acted as an emergency physician "practicing. . . under similar circumstances." Haw. Jury Instruction 14.2 (Standard of Care). The Court notes that, per Mrs. Millard's testimony (as corroborated by Dr. Brott's February 1 narrative note), Dr. Donovan was aware that Mrs. Millard had an appointment with her treating neurologist, Dr. Eidelman, in four days' time. Indeed, there is some evidence that Mrs. Millard "negotiated" to be able to return to Jacksonville to see Dr. Eidelman. Given Dr. Donovan's conclusion that Mrs. Millard was not experiencing an emergency, the Court finds it reasonable that Dr. Donovan would defer to Mrs. Millard's treating specialist, especially given the short time lag in between. This finding is bolstered by Dr. Kelen's testimony that the discharge instruction to "keep your scheduled appointment" indicates a referral back to Mrs. Millard's treating physician, which, in this instance, satisfies the emergency physician's standard of care. Doc. 20, Trial Tr. February 9, 2010, Dr. Kelen, p. 248.

chronic back pain and sciatica, in the words of Dr. Kelen, is "astoundingly unexpected."[82]  It is through this lens that Dr. Donovan's assessment of Mrs. Millard must be viewed.

The Court is satisfied that Dr. Donovan performed an adequate historical and physical assessment of Mrs. Millard under the circumstances.  The record indicates that Dr. Donovan took a history and performed motor and sensory testing, however brief.[83]  With regard to motor testing, the Court finds that Dr. Donovan conducted a test for dorsiflexion of the great toe, which was normal.  The Court is persuaded by the testimony of Drs. Kelen and Harrop that for purposes of Mrs. Millard's particular presentation (i.e., that her disk extrusion occurred at the level to which the dorsiflexion test is focused) this result had significance.  The Court also finds that Dr. Donovan tested the flexion and extension of Mrs. Millard's hip as indicated on his T sheet.  In addition, the straight leg raise and reflex testing which Drs. Aronson and Frankel contend should have been done would not have better informed a CES diagnosis.  Dr.

_____

[82]     Id. at 245.  As Dr. Kelen stated, "[S]omeone who's had a long history of sciatica and they come in with another exacerbation, you go through this mental agility of, Well, yes, I still have to think of aortic aneurysm and epidural abscess, along with the cauda equina.  I ask my series of questions.  And a lot of the differential goes flying off [based on the history obtained] and I'm left with exacerbation of this chronic back pain, which is the vast majority of what we see.  That doesn't mean there are never any bad outcomes. But that's mal-occurrence, not malpractice."  Id. at 245-46.

[83]     This finding is evidenced by the T sheet and Mrs. Millard's concession that at least some testing – though she could not identify what exactly – was performed on her lower extremities.

Donovan's testimony, the T Sheet, and Mrs. Millard's testimony that Dr. Donovan "ran something over one of [her] feet" indicates that a sensory examination was also performed.[84] Lastly, the Court is unpersuaded that any pre-existing neurologic deficits related to Mrs. Millard's left-sided sciatica pain would necessarily have presented themselves upon examination at Tripler.[85]

A great portion of the trial testimony revolved around Mrs. Millard's complaints of urinary hesitancy. Both Dr. Donovan and Mrs. Millard were credible witnesses on the subject, and the Court is unable to determine with certainty whether this information was relayed to Dr. Donovan. Ultimately, that Mrs. Millard was able to urinate at Tripler and did not identify any loss of bladder control prior to January 30 are the most telling facts. The Court is persuaded by the testimony of Drs. Kelen, Frankel, and Harrop that Mrs. Millard's ability to urinate on her own at Tripler was significant enough for an emergency physician to conclude that her bladder function was normal.

---

[84]    This finding is supported by Dr. Donovan's testimony that the testing can occur in a matter of moments, which was echoed by Dr. Frankel. See Doc. 19, Trial Tr. Feb. 8, 2010, Dr. Frankel, p. 56. Mrs. Millard's description also appears to corroborate the appropriate testing described by Drs. Kelen and Frankel, who stated that a paper clip, pin, or the doctor's hand is run over an area to gauge the patient's sensation.

[85]    For example, Plaintiffs contend that a careful motor examination should have discovered Mrs. Millard's pre-existing left leg weakness; however, when she complained of the same problem in September of 2004, Dr. Lamer was unable to identify any focal weakness in her lower extremities. In addition, there is no evidence that Mrs. Millard made specific complaints about these deficits to any member of the Tripler staff. In Mrs. Millard's prior examinations – such as her 2004 St. Luke's visit and her pain management consult with Dr. Lamer – she made specific complaints of these symptoms, which prompted further testing.

Thus, Dr. Donovan accurately documented that Mrs. Millard was not experiencing bladder dysfunction at Tripler.[86]

Dr. Donovan's questioning and assessment of Mrs. Millard therefore led him to conclude that she was not experiencing bladder or bowel dysfunction, saddle anesthesia, weakness, tingling, or numbness. The lack of these symptoms allowed Dr. Donovan to eliminate the presence of a surgical emergency – including CES – from his differential diagnosis of Mrs. Millard. As Dr. Kelen testified, given the absence of bowel or bladder dysfunction or any motor or sensory deficits to accompany Mrs. Millard's pain, and given that she was able to walk upon re-examination,[87] the standard of care did not require Dr. Donovan to order either imaging or a neurosurgical consult. In addition, Dr. Donovan's discharge instructions advised Mrs. Millard to "return if worse" precisely because her symptoms at the time were not indicative of anything other than an exacerbation of her chronic low back pain. Mrs. Millard later experienced a disintegration of her condition accompanied by more severe symptoms, and did in fact return to the emergency room at St. Luke's on

---

[86]     In making this finding, the Court rejects Dr. Aronson's conclusion that Mrs. Millard's urine sample was provided involuntarily and via incontinence. The Court's position is supported by Mrs. Millard's testimony that she was able to urinate voluntarily in the Dallas and Jacksonville airports (after being assisted into the restrooms) during her trip home from Hawaii.

[87]     Given that Mrs. Millard was able to walk upon follow-up, Dr. Donovan was not required to repeat his previous motor and sensory exams (which were negative).

January 30 as she had been instructed.[88]  Thus, as to the medical care provided by Dr. Donovan, Plaintiffs have failed to prove by a preponderance of the evidence that the patient history obtained from Mrs. Millard, the physical assessment and re-assessment of Mrs. Millard, the failure to order imaging or a neurosurgical consult, or the discharge instructions given to Mrs. Millard, violate the standard of care required of an emergency physician in these circumstances.

Concerning the adequacy of the nursing care, Plaintiffs have failed to prove by a preponderance of the evidence that the standard of nursing care required Nurse Pardue and Cpt. Hatcher to more fully document their assessments and re-assessments of Mrs. Millard.  Further, the Court concludes that any potential standard of care issue that might have arisen with regard to Nurse Pardue's alleged failure to document and relay Mrs. Millard's complaints of urinary hesitancy to Dr. Donovan is rendered moot by Mrs. Millard's testimony that she directly informed Dr. Donovan of the problem.

Because Plaintiffs have failed to establish that the Tripler medical staff fell below the standard of care, the Court need not go further.  Nevertheless, for completeness, the Court also expresses serious misgivings about the proof adduced by Plaintiffs concerning both causation and damages.  Plaintiffs' expert on causation, Dr. Aronson,

---

[88]     Though it is entirely irrelevant to the instant case, the Court notes that given the evidence presented, the conduct of the St. Luke's emergency department – which documented Mrs. Millard's increasingly alarming symptoms in a triage note, but never provided her medical attention – appears to have been far more problematic than that of the Tripler staff.

could only say that Mrs. Millard would be "better than she is now" had surgery been performed sooner, and was unable to quantify this improvement. In addition, Dr. Aronson conceded that if his theory that the full extrusion had occurred on January 28 was correct, any resultant neurological damage to Mrs. Millard might have occurred immediately, in which case she would have been no worse off for the delay in surgical intervention. Moreover, and surprisingly, Plaintiffs presented no medical testimony from either Mrs. Millard's current treating physicians or an expert, and relied solely on a life care planner and Mrs. Millard herself to describe her current and likely future medical condition. Dr. Hofmann, the government's independent medical examiner, opined that Mrs. Millard needs no further medical care and faces no occupational or daily living restrictions as a result of her CES diagnosis. The Court would be hard-pressed to find in favor of Mrs. Millard without expert medical testimony as to how any neurological deficits suffered by Mrs. Millard as a result of CES could be differentiated from those she exhibited previously; moreover, there is a complete lack of expert medical evidence to support her life care planner's testimony concerning damages.[89]

---

[89]     The difference between the life care plan valuations submitted by the Plaintiffs and the government was staggering: Mr. Roberts' life care plan for Mrs. Millard had a present value of $1,055,548.33 (with an additional $333,184.00 in present value for Mr. Millard's past and future loss of household services); Mrs. Cash-Howard's life care plan for Mrs. Millard, by contrast, had a present value of $47,534.00. In their proposed findings of fact and conclusions of law, Plaintiffs have said they are not seeking the full amount proposed by their life care planner.

-45-

## III. Conclusion

The Court is admiring of both Mrs. Millard, who has been through more than her share of medical travails and has borne them bravely, and Mr. Millard, who has supported her even in the most difficult of times. They are understandably frustrated by Mrs. Millard's ongoing health issues and their belief that they made fruitless visits to two different emergency departments. In hindsight, it is possible (but by no means certain) that if she had received an MRI at Tripler, Mrs. Millard's condition today would be improved to an unquantifiable extent. Similarly, if the St. Luke's emergency department had been more responsive (or Mrs. Millard had remained until she was seen), the picture today might possibly be different.[90] We will never know. However, we do know that when the Millards brought their case to this Court they assumed the burden of proving by a preponderance of the evidence that Dr. Donovan and the Tripler nursing staff fell below the standard of acceptable emergency department care in their treatment of her. I conclude that they have failed to carry that burden. As a result, judgment will be entered in favor of the United States on all claims.[91]

---

[90]     The Millards are also justifiably upset that they were unable to receive an earlier appointment to see her treating doctor in Jacksonville.

[91]     The pending Motion in Limine Regarding the Preclusion of Deposition Testimony (Doc. 15) is **DENIED** as moot.

**DONE AND ORDERED** at Jacksonville, Florida this 14th day of May, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies:
counsel of record